The Honorable Arthur Tarnow from the United States District Court for the Eastern District of Michigan. We're delighted to have you with us. And we request that each appellant indicate how much time he or she would like for rebuttal. Would the clerk call the first case. Case No. 13-273 and 13-276, Cobra Corporation et al. v. Waste Mgt of Ohio Incorporated et al. and Coca Cola Enterprises Incorporated et al. Oral arguments be 20 minutes for the appellant, the plaintiff 15 minutes for the defendant, and 5 minutes for the amicus. The case is over for the appellant. Thank you, Your Honor. Appellants would like to reserve 5 of the 20 minutes for rebuttal. Fine. Your Honors, may it please the Court, there are two issues in this case. The first issue is what part of the Superfund Act, CERCLA, applies to a private party's civil action to recover its costs from other potentially responsible parties, PRPs, after the plaintiff enters into an agreement with EPA to perform a study of the site known as a Remedial Investigation Feasibility Study, or RIFS. This Court, in the ITT v. BorgWarner case, held that that action is a 107 action under CERCLA. The second issue is that, after selecting the proper vehicle for suit under the statute, Section 107, Cost Recovery, as this Court held in ITT, or Section 113, Contribution, what is the proper statute of limitations that applies? Three years after completion of the work agreed to, as we contend, or three years after signing, as the District Court found contrary to this Court's prior ruling. All parties agree that the first question, whether 107, Cost Recovery, or 113, Contribution, is the claim here, comes down to whether the agreement EPA and the plaintiff signed resolved the plaintiff's liability in an administrative settlement, as those terms are used under CERCLA 113, F-3B, for the work and payments agreed to. The question comes down to whether liability is resolved at the moment of signing of the agreement, or is it resolved when work is certified as completed and payments fully made, where, in the agreement, plaintiffs admit no liability, EPA expressly conditioned its covenant not to sue on completion of the work, and EPA retain discretion to terminate the agreement or take over the work under various circumstances outlined throughout the agreement. Well, it was certainly much more resolved after the agreement was signed than before. I mean, you know, I mean, if you do certain things, then it's, you're not going to have any further liability. Their ability on their side to terminate is limited. You get sort of one, you know, free violation, as I understand it. You have to go to, they have to go to a dispute resolution and so on. I mean, surely it's fair to say you're very differently situated after you go through the, I would imagine, considerable trouble of entering into this agreement than you are before. Is that common? I mean, can we have that be common ground in this case? Well, I wouldn't put it exactly that way. The way I would put it is that before the agreement is signed, there's no agreement. When the agreement is signed, then you have an agreement. In common terms, you might call that a settlement. But in this particular case. And the agreement's binding, correct? I mean, it's creating obligation. It's a factual obligation on both sides. That's correct. But that doesn't resolve liability. Well, but is resolution just such a black and white issue? I mean, first of all, let's back up one step. As I read the statute, and please correct me if I'm wrong, because I could be wrong about everything I say about this case, but it seems to say that the agreement only needs to resolve some of your liability in order to put you in this 113 corner, to limit you to one. 113 F-3B, Your Honor, does say some or all of the liability. But let me back up a little bit. But isn't it true, then, that the agreement only needs the question before us, at least the question for your first issue is, does this agreement resolve some of your liability? Is that fair? That's fair. Okay. And my answer to that is that the agreement resolves no liability at signing. I do want to correct one point about. Doesn't it purport to resolve liability issues? Well, there is certainly a statement in there by the parties that the agreement constitutes a settlement agreement under 113 F-3B that resolves liability. That statement comes out of EPA's model. It's boilerplate. But it's a statement in a contractual agreement. It is a statement in a contractual agreement. But the question is, does one just look at that statement for determination of whether liability was resolved, or does one look at that entire agreement? If you look at the entire agreement, then you find in every case where there is liability, nothing has been resolved at signing. I did want to back up on one point. Certainly, the covenant not to sue is conditioned. It's a performance-based conditional covenant not to sue. That's what the Seventh Circuit called it. Even though, theoretically, the covenant not to sue is effective immediately, in reality, it's the same as the ITT covenant not to sue and the other covenant not to sue that EPA has put into these agreements. If you don't do the work two weeks after you sign the agreement, if you walk off the job, EPA can sue you under 106 or 107. But if you are working, they can't sue you. Well, why would they sue you if you were working? Well, I don't know. They wouldn't sue you. If you're doing the job, there's no lawsuit. The key point is your liability is out there under 106 or 107 until you complete the work and pay all the costs. Now, the other point I was going to make about what some people call re-openers that EPA has, there are actually five places in the agreement where EPA can step in, take over the work, and complete the work. There's a section called work takeover. There are other sections. U.S. EPA reserves the right to conduct the work itself at any point to seek reimbursement from respondents. EPA can step in in its discretion. There is a dispute resolution provision. The district court missed that. But the dispute resolution provision, like all administrative agreements with EPA, the ultimate decider in the dispute resolution is somebody at the regional level of EPA. So they hold all the cards on dispute resolution. Step us back one step. Why does this matter? Why does the re-opener issue matter? The five places where EPA can step in, why does this matter? Well, certainly this court thought it mattered in ITT, but I think it matters because it shows that the respondents who sign up to do the work never have a full resolution of liability until the work is completed. If EPA can step in, finish the work in its discretion, and then sue us under 106 or 107 of CERCLA, then there's no resolution of liability. We're still open to being sued. Same for the covenant not to sue. This agreement recited that you had this immunity to contribution actions from other PRPs, correct? There is a contribution protection section. That's sort of the deal, right? I mean, as I understand it, in these sorts of resolutions, when you get limited, and I know you might not agree with the idea that it's either 107 or 113, but when you get sort of put off in the 113 corner, you also, as a benefit, as I understand it, get protection against other PRPs seeking contribution from you. That's a little bit of a complicated issue. 113F2 in the statute provides contribution protection when you resolve liability in a settlement. And you got that protection in this agreement, correct? Well, that's an interesting question. The agreement purports to give it to you, correct? There is a purport in there. But the statute and Congress never delegated the power to give contributions. Right now I'm just focused on the agreement. So the agreement purports to give you that protection. And the question is, does it have any value, and when do you really get it? Well, I mean, there is a certain irony that you got at least ostensibly that protection, and you haven't been sued by any other PRP. I don't know if there would be any reason for them to have sued you. But you got that protection. And I just wonder, you know, if you had been sued, would you say, oh, actually, yeah, go ahead and sue us? I mean, we do have that recitation, but all this is sort of not effective until we finish our job? Is that what you – is that the way you would read that? I think that's correct. I don't think we have the contribution protection. Do you think we ought to read, you know, agreements that way in these cases? Settlement agreements are supposed to create more certainty, not chaos. Well, this is EPA's model. We didn't write it. Well, you signed it. We did sign it. There's no question about that. I don't worry too much about who wrote it. But I will mention that the Seventh Circuit in the Bernstein case noted that EPA has great weight to influence what the wording is in these cases. Oh, I imagine you're right about that. Now, but I do want to say one more thing about contribution protection. It's very important. The contribution protection language and the 113F3B language both use the expressions resolution of liability. If you haven't resolved your liability under 113F3B, then you're not entitled to contribution protection under 113F2. Our position is, and the position of the ITT court and the Seventh Circuit in Bernstein, is that you don't get that resolution of liability under 113F3B that gives you the contribution action or the contribution protection under 113F2 until you finish the work and pay all the costs. That's our position. That's the only two. Did ITT hold that in the manner you just said? I don't recall it being that crystalline. Well, not on the contribution protection part, but certainly on the 113F3B part. I'd looked at the language, resolved liability, same language in 113F2, and concluded we hadn't resolved liability. But that was based on the particular settlement agreement in ITT, wasn't it? That's right. And here's the difference between the ITT settlement agreement and the Bernstein settlement agreements and ours. The difference is, after the Avial case, EPA said we'd better beef up our models because we're losing on the issue of contribution and we want to put in language that helps us argue or helps us take the position that there is a resolution of liability at signing in these agreements. That is not a determinative. The fact that that language got in the agreement, in my view, is not determinative of this issue. There are other provisions you have to look at. The reality of these agreements are all the same. The covenant not to suit doesn't really kick in until you finish the work because if you stop working or EPA decides to take over, you're still subject to suit under 106 or 107 of CERCLA. Isn't that true on every contract? Well, no, here's the difference in every contract. In a contract, here's the way this contract could work where there truly is a resolution of liability. EPA says your liability under 106 or 107 for this work and these costs is hereby terminated. Covenant not to sue, in effect, no reservations, no conditions. What we have then, EPA, to enforce the contract is a contract claim. You can go to court and say we've got stipulated penalties. We've got all the other enforcement mechanisms, interest. That's how you terminate liability. Take out CERCLA liability, 106 or 107, end it, and then let EPA pursue its remedies under the contract, contract remedies rather than CERCLA remedies. I would concede that that is a resolution of liability, but EPA obviously wants to keep everything and all its options and being able to take over in five different places in the agreement and have its ability to sue under 106 or 107 because they've conditioned the covenant not to sue. That's a very coherent argument. No circuit court, I guess, has adopted that sort of more absolute approach. Bernstein has in the Seventh Circuit case. Did they say it has to absolutely and immediately extinguish liability and then any suit by EPA later? They said an immediate termination of liability, an immediately effective, truly effective covenant not to sue. Tell me again what that case was. This is the Seventh Circuit case dealt with two different similar administrative orders. The citation is 733F3190. EPA then asked for reconsideration. EPA said we can never do these agreements if we have to give a complete release at the outset. And it went into that issue. Bernstein is probably the case that goes most deeply into the issues of resolution of liability. The ITT case from this court did not go as deeply into it, but came to the same conclusion. The only two appellate courts so far that have really dealt with the issue of resolution of liability under 113F3B, as well as 113F2, the contribution protection section, are the cases I've mentioned. And this case will be the third one. Well, suppose that we think that this settlement agreement is qualitatively different. Is there any hope for your clients? There's always hope for my clients, Your Honor. What is your fallback argument? Well, it's qualitatively different only in the sense that EPA has essentially tried to bootstrap its position into the statute. And this court is not... I'm saying suppose we don't agree with you on this. Well, then if it's qualitatively different, well, I'm not sure I understand what you mean by don't agree. If you have a section... My question is, is this your one and only argument that you want to make your yellow lights on? If this is all you want to focus on, that's fine. If there's any other argument, well, your red light's on now. Well, I'll do it on rebuttal, Your Honor. Do you want me to finish your question? If you would like to, that would be fine. Yes. I'm not sure what you mean by one and only argument, but we believe that the agreement that we signed has the same material features as the ITT agreement and the Bernstein agreement. In fact, all of EPA's administrative orders have that. That is the same argument that you've been making, and we appreciate that. Okay, thank you. Thank you. Thank you. Good morning, Your Honors. May it please the Court. My name is Glenn Harris. I'm here on behalf of both the Hobart I and Hobart II parties. You may want to speak up. I'm sorry, to discuss with Your Honor the issues today. Let me follow up on your questioning, because I think you folks were dead on. This is a contract. Well, let me, I mean, if we're going to just pick up where we just left off, why doesn't Mr. Silver have a point about this Bernstein case? I mean, I'm just reading what happens to be in the brief here, and the case does kind of say what Mr. Silver just described it to say. It does say, look, if you want to resolve liability, structure your contract so that liability is resolved immediately, or you can choose to leave the question of liability open through inclusion of reservation of rights, conditional covenants, express disclaimers of liability. I mean, it is fair to say we're in the second category here, right? I got lost on the second category. One is immediate resolution of liability. Two, second category, parties may choose to leave, and this is on page 25 of the blue brief, parties may choose to leave the question of liability open through the inclusion of reservations of rights. We have here conditional covenants and express disclaimers of liability. Now, maybe we shouldn't follow this case. It's not one of our cases, but it's fair to say we're in the second category here, right? Well, the problem with Mr. Silver's argument is… Well, I mean, to begin with, it's fair to say we're in the second category here, right? I'm sorry. I'm not following, but the second category… The second category, I mean… I'm sorry. You know, the question of liability remains open because parties have reserved rights. There are conditional covenants and express disclaimers of liability in the agreement. I mean, I'm just trying to find what the common ground is and move from there. I mean, it seems indisputable we have those things here. Isn't that fair? We have conditions that say that if you materially breach the contract, as Judge Tarnow was suggesting, standard contract law, if you materially breach the contract, the other party is excused from performance. So no matter what the covenant is, even if the covenant not to sue just said you get a covenant to sue immediately just like it did, it doesn't actually have to say, oh, by the way, if you breach the contract somehow materially, then my covenant not to sue goes away and I'm going to sue you. That's the flaw in that argument. That's why Judge Tarnow is… But there's a lot more than that that brings this into kind of a more gray area in terms of the resolution of liability. I mean, Mr. Silver does have a point. I mean, this isn't just, you know, you pay me a million bucks and I release my claim. Far from it. This is nothing like that. That's true. But let me point out a key difference with the Bernstein opinion, which… Yeah, that's what I'm asking. …he overspoke. He overspoke because the language in the Bernstein opinion says, the covenant not to sue says, it is effective only upon issuance of a certificate, a notice of completion by the EPA when the work is done. That's what the Bernstein one says. Ours says it's effective immediately and we get to take it back only if you don't perform under the agreement. That is night and day different. So there is no way that Mr. Silver is correct that the court held that these agreements are open-ended, that language is materially different, materially different. Okay. And the same is true of the ITT agreement. That's the old form. Both the ITT opinion, AOC, and the Bernstein AOC are old form documents. But your opponent is saying that the changes are really not material changes. How do you respond to that? Simply, he agreed that they were material changes. As Your Honor has already pointed out, this is a contract. It says right in it two things. It says, we agree that this is an F3B settlement giving us the right to sue. It also says, equally importantly. Where is that in the agreement? This is, we agree this is an F3B? It's in paragraph 96B. The parties agree that this settlement agreement constitutes an administrative settlement for the purposes of section 113F3B of CERCLA, pursuant to which the respondents have, as of the effective date, resolved their liability to the United States for the work and future response costs. And the paragraph right immediately preceding that says, the parties agree that this settlement agreement constitutes an administrative settlement for the purposes of 113F2 of CERCLA, the citation, and the respondents are entitled, as of the effective date, to protection from contribution actions or claims as provided in sections 113F2 and 122H4 of CERCLA for the matters addressed in the settlement. It says, as of the effective date, and there's a provision that says the effective date is the date of signing? Exactly correct, Your Honor. So what do we have here? We have a contract. We're not talking allegations in a complaint or anything like that. These parties made this agreement specifically so that they could get exactly what they got. They got a covenant not to sue. Now, we can talk about effective immediately. First, it says it's effective immediately. But, in fact, that forced the government to stop its enforcement action. There was enforcement action that led up to this. The government came to these folks and said, you better do this or we're going to sue you. And they said, well, we don't want to be sued. We'll sign this agreement in which you covenant not to sue us. And that's exactly what happened. Now they're here telling you that even though they agreed that it says it's an F3B settlement, even though they agreed that it was a settlement under 122H, it just isn't true. That's their argument, really, at the heart. That's their argument. And I would suggest to you just what you suggested, Judge Cather. This is a contract. We all know that the pole star of contract interpretation is to discern and then enforce the intent of the parties. There can be no doubt whatsoever that the intent of both the United States and the plaintiffs here was that this was an F3B settlement, that they had the right to go sue us, which is exactly what they did, and that they were immune now, as long as they complied with the contract, from further enforcement action. That's the bargain that they got. And they're now telling you, well, we didn't really get that bargain. We got nothing. That's really their argument. They're not arguing their fingers were crossed. I didn't hear him say that, Your Honor. So I think this is dispositive of this case. They agreed. I specifically read to you that they agreed that it was an H4 settlement on purpose because that disposes of their statute of limitations argument as well because even though we think that 113G3, which is the contribution section of the statute of limitations, should be read differently than they're proposing, even if it's read as they're proposing, it expressly includes an H4 settlement. And they've agreed that it's an H4 settlement. So just to be really clear, if Your Honors agree that what they said is true and it is an H4 settlement, this case is over because that eliminates their resolved argument and it also eliminates their statute of limitations argument. They're both gone now. And by the way, it really is an H4 settlement. I mean, it's not just that they said it. It really is an H4 settlement. You know, 122 CERCLA talks about instances in which the United States can settle a case. And 122 grants the President the right to settle any type of CERCLA claim and then it has some rules and provisions that detail those things. And 122H gives the United States the authority to, quote, consider, compromise, and settle a claim under Section 9607 of this title for costs incurred by the United States government. End quote. That's what H says. And the words for costs incurred do not limit the nature of those costs. It's a past cost, a future cost, or for that matter, any other cost. We could rewrite that section of the statute by saying for the authority to consider, compromise, and settle a claim under blah, blah, for past or future costs incurred by the United States government and we wouldn't have to change the word incurred. So nothing in the statute says they have to be past costs or future costs. It's just costs incurred. Well, the plaintiffs agreed to reimburse the EPA for its oversight costs. Well, just as they agreed in this contract, oversight costs are costs incurred by the United States. So it's absolutely clear that this is an H-4 settlement. The costs incurred by the United States are truly incurred. I mean, is it necessarily one or the other? I mean, in other words, couldn't the EPA be exercising, or the President, be exercising authority under A, 122A, and 122H in a single agreement, or is that not possible? I think it's possible. I think it's possible. Because here there do seem to be arguably characteristics of both. Is that fair? Yes. In fact, if you look at your opinion in RSR, the court there looked at that consent decree. It had a resolution of past costs, it had a resolution of future costs, and it had the parties perform work. And the RSR court said that is an H settlement. On those facts, the payment of past costs and future costs is an H-4 settlement. And they also referenced D, 122D, Your Honor, which is the provision that talks about work in 122. So actually this court has already held that the settlement before you today is an H-4 settlement because it resolves their future costs claim, their oversight costs claim. And again, that's the end of this case, if you agree with me on this. And the agreement, by the way, the RSR quote is at page 54, and the quote said, in view of the apportionment of liability for past and future response costs among the United States, RSR, and its co-defendants, the consent decree was a cost recovery settlement under 122H as well as a cleanup agreement under 122D1. That's at page 558. So this wasn't a 122H settlement. There's every reason in the world that these folks agreed it was a 122H settlement. And again, back to a contract analysis, if... Will you and your clients escape any liability for paying for the cost of cleaning up due to your having put product in this dump?  So I agree that you have to take their allegations as true, but those allegations are disputed. So please, if you have to, on a motion to dismiss... If you dumped in the dump, will you be excused from making any payments to anybody if we take your position here? Yes. Because the government can't go after you? Well, no, that's a very good point. Yes, I back up. Yes, the government can come after us because we don't have a covenant not to sue. You're right. He can't come after us, but the government can still come after us. We are fair game for the EPA, which is the whole... Back to my point, which is the reason they signed this agreement. They didn't want to be in the fair game category anymore. They're not in the fair game category. I'm in the fair game category. Nobody wants to be in the fair game category. So, yes, I did misspeak. Yes, I am still subject to liability at a minimum to the United States of America, to a state, and to an Indian tribe under 107A, which is who gets to bring a 107A action. So, yes, I have not escaped liability. I don't owe him any contribution, but I have not escaped liability. And, you know, there's lots of good reasons why there's statute of limitations. I don't need to tell you folks that. You understand by statute of limitations say what they have. And it is unfortunate for them that they slept on their rights, but they slept on their rights. They had three years to bring this claim, and they waited too long. So, as to them, you're correct. We will not pay any money for the costs sought in that lawsuit to them, but I am completely exposed to the United States or the state of Ohio if they want to come after me for whatever they want to come after me for. So it's not like I'm down the road and never hear about this case again. In fact, we've already been sued again in what we're calling Hobart 3 based on a new administrative settlement agreement and consent order. We've already been sued again by the same plaintiffs under that case. Did your clients take the position earlier in this litigation that this was not a qualifying administrative settlement? Some of my clients did, and some of them didn't. I'm not trying to be cute. The Hobart 1 plaintiffs, whom I'm standing here on behalf of, did say that in a brief. The Hobart 2 plaintiffs consistently said that it was an F3B settlement. Of course, we got sued two years later after Judge Rice had already decided that it was an F3B settlement and dismissed those claims. What justifies some of your clients flip-flopping their position? Because we're lawyers. But here's the difference, and I didn't mean to be smart about that. It's not as satisfactory. Okay, let me try a different way. Let me rephrase. As Mr. Silver does point out, there are things you can alternatively plead, and there are reasonable differences about law. The distinction I want to make is that, yes, Hobart 1 people flip-flopped, just like the plaintiffs have flip-flopped, but they agreed in a contract that it was true. I never agreed in a contract it was true. It's something that some of my clients said in a brief. So, yes, we flip-flopped. But that's materially different from agreeing in a contract to something instead of just making an argument in a brief, Your Honor. Thank you. Thank you, Your Honors. Good morning, Your Honors. Nicholas Demasi on behalf of the United States, and may it please the Court. The main point that I want to make here this morning is that construing this settlement in line with the party's expressly stated intent to resolve liability and thus give rise to contribution rights is absolutely essential to the prompt cleanup of contaminated sites under the CERCLA regime. I mean, I think we get that. I mean, we understand your policy argument in the brief, but at least speaking for myself, I mean, at the end of the day, we're applying a statute here, not a policy argument. And you're also applying an agreement that we answered into with the plaintiffs. Let me ask you, I mean, in your view, is the party's recitation in 96B itself dispositive, end of story? And if not, exactly what effect does it have in determining whether this agreement does, in fact, resolve some of Hobart's liability? It's not dispositive all on its own. What it does is it memorializes the party's intent at the time of signing the agreement to achieve a specific purpose, and that is resolve liability and give rise to contribution rights and protection under the statute. The party's intended, but how does that then affect our determination  So essentially what it means is that if we can stand here and have a considered debate about whether or not the objective manifestations on the face of this agreement resolve liability, that your decision should be guided by, if at all possible, achieving the party's intent as they stated on the face of the agreement. And what we would contend is that this document actually has all of the objective manifestations that the courts of appeals, including this court's decision in ITT, have stated are necessary to resolve liability to the United States. Does that include the Bernstein case? It does include the Bernstein case, and that's a very important point because that covenant not to sue may not be sitting directly in front of you, but I want you to know that covenant not to sue specifically stated that it did not go into effect until we issued a notice of completion for the entire work at the site. That is very different than this covenant not to sue, which said it takes effect immediately. And on that point, also, I'd like to steer your honors to this court's decision in RSR, which specifically stated that a promise to perform under this type of agreement in exchange for EPA's covenant not to sue constitutes a resolution of liability. That's in the RSR decision. There's another case that I'd like to point you to on that point. It's an Eighth Circuit case named Dravo v. Zuber. It's cited in the plaintiff's brief. It's 13F3-122. And that case also explains that merely because you state that your covenant is conditioned upon satisfactory performance under the agreement, that doesn't mean that you don't actually have a real covenant. It just means that the covenant is subject to a condition subsequent, as it's known in the contract law. And so if you breach the agreement, then, of course, the covenant would evaporate. The other very important objective manifestation of resolution of liability that's on the face of this agreement is that there is an immediately effective covenant not to sue over the costs incurred by the United States under Section 122H. And that basically complies with this court's decision in ITT. So the two primary decisions that they rely on are Bernstein and ITT. And what we're saying is that on the face of this document, you can see how we complied with those requirements to resolve liability. We stated that's what we were trying to do. And so you should construe this agreement in order to give effect to the party's intent to resolve those issues. One question that I have is, was this settlement agreement published in the Federal Register? I think CERCLA in 122I requires that 122H agreements be published in the Federal Register. I don't know the answer to that question off the top of my head, Your Honor. I apologize. Another question is, if we were to rule against your position here, would various government agencies be potentially responsible parties liable to pay the plaintiffs here? No, Your Honor, because they gave us a covenant not to sue in this agreement. I mean other entities, like the Department of Defense and things like that. Correct. I understand your point. And the answer is no, because there's a covenant not to sue by the appellants not to sue the United States, which covers the entire United States, over the matters addressed in this agreement. So our argument here does not depend upon our interest in not being sued. That's already been resolved by this agreement. But none of the sub-entities of the U.S. can be sued because of the agreement you're saying? That's correct, Your Honor. I see my time is up. I did have a few points about the important policy ramifications of this agreement. If you'd like me to make those points, I can make them. I think in fairness, if your time is up, your time is up. Thank you. Very well. Thank you very much, Your Honors. Well, I'm going to need these five minutes, Your Honor. Starting with the backup argument, I apologize, I went blank. Yes, we do have a backup argument. It's on point two. If the court determines that we have a 113 contribution action, we have made a fairly extensive argument in our briefs that the 113G3 statute of limitations provision doesn't provide for the kind of settlement that we entered into here, an RIFS settlement, a work settlement. Nothing in 113G3 addresses that, and for good reason. A work settlement is addressed by 104B, and this goes to my opponent's point about 122H4. And by the way, Your Honor, no, this agreement was never published in the Federal Register. That's because it's an agreement under 104A and B of CERCLA. Language in 104A and B was added to CERCLA in 1986 for the purpose of allowing EPA to stop doing the RIFSs themselves and basically deputize authorized parties that they agree will do it properly and require them to pay EPA's oversight costs. It's a very important point. We essentially are deputized to do the work for EPA. Mr. Harris characterized us as having received a claim. We didn't get any. There was no claim or enforcement threat against us. We got a PRP letter, and then we were asked, do you want to do this work? And we said yes. That's under 104B. 122H. Well, it's not like you were hired here to do the work, right? But we had to be qualified to do it for EPA to let us do it under the language of 104A. That's an important point. They don't sue you and then tell you to do the work. They request that you do the work, consider your qualifications, get you to agree to pay their oversight costs along the way, and then you do it. That's what happened here. 122H.4 is a completely different provision. That language in 122H.4 talks about, as Mr. Harris quoted, consider, compromise, and settle a claim under 107. There was no claim against us for costs. That section goes to past cost settlements and what you could call cash-out settlements for the entire site. 122H.4 is thrown into the agreement by EPA and its model, but that's not what we did here. There was no past cost settlement. A past cost settlement is an easy 113F.3B issue. Why? You pay immediately, you resolve your liability immediately, you get your contribution claim, and you get your contribution protection. That's where you need contribution protection because EPA will compromise its claim. Can't you settle for future costs? I suppose you can. Hypothetically, without getting mired in particular statutes, can't you and the EPA say, yes, your clients don't stop? That can be done. That's the two kinds of 122H.4 settlements, and the EPA guidance covers that. One is a settlement of past costs where you pay less than the whole amount, you get contribution protection for the remaining amount, and you get your covenant not to sue. EPA can also do a cash-out settlement. Pay now, pay a premium, and you're out of the site. That's the nature of a 122G settlement, also identified in the statute of limitations section for de minimis parties. Pay now and you're out of the site. That's what they mean when they talk about resolving liability, and that's why those are the only two administrative orders identified in 113G.3. Everything else, the statute works if you view the work orders, and I'm not talking about consent decrees. I'll get to that in a second, if I have a second, views those as not resolving your liability. RSR was a consent decree, a totally different picture. Consent decrees automatically get you a contribution action under 113F1. They didn't even have to go any further than that. 113F1 says, during or following a civil action, consent decrees are always filed in court, even as a pro forma complaint, and settled and goes to the federal register and then entered by the judge if there's no appropriate objections. So the point is RSR is an easy case to resolve. I mean, globally here, 30,000 feet, is it fair to characterize your argument in light of the applicable law here to be that, you know, we have to admit by the terms of the contract, you have to say it was our intent to enter into an agreement that a 122H agreement that invokes section 113F. That was our intent. But we actually sort of bungled it and we didn't achieve that intent. That's basically your argument today, isn't it? I would say it a little differently than that. Remember, there's a statutory interpretation part of this, and EPA has tried to displace the courts. It's almost as if their section said, this agreement resolves liability regardless of what the courts say. And we agreed to that kind of language. Well, it was put on us and we agreed to it. That's only one part of the contract. A contract, you've got to look at all four corners. This was one corner. Look at the other three corners. No, only a conditional covenant not to sue. Reopeners, and I want to give you where the reopeners come into play because they didn't get into our brief. The red light is on, so you can finish your sentence. I will finish my sentence. Looking at the contract as a whole and the provisions that ITT and Bernstein relied upon, this did not resolve liability regardless of what the parties said. And that's your job to determine. We thank all of you for your argument and for your briefs, and we will do our job. So the case will be submitted.